The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good morning, counsel. I'm joined by my dear friend and colleague, Judge King, who's on the phone, and Judge Diaz, who you can see on the screen. I'm going to ask all counsel who are not arguing in the first case to please, I guess, not mute, but dim your video. All right. I think that everybody's done that. Mr. Walters, you may proceed. Good morning, Your Honor. Again, may it please the Court, Neal Walters for the appellant in this case, Wayne Burnley. This case presents two sentencing issues. The first is the propriety of a three-level role in the offense enhancement under 3B1.1b of the sentencing guidelines. And the second issue is a two-level enhancement for reckless flight from arrest under 3C1.2. I'm going to take the issues up in that order. 3B1.1b authorizes a three-level enhancement if the defendant was a manager or a supervisor. The guideline itself doesn't say much beyond that. The Court has said that we use the standard dictionary definition of that. However, in comment four in the notes, the guideline sets forth seven factors that a district court is supposed to consider when it makes this determination. And this Court has indicated on a number of occasions the importance of the district court actually considering and articulating its consideration of those factors. First error we submit, Your Honors, in this case is that the district court didn't do that. If you look at the district court's decision, the sentence in hearing, trial counsel did note an objection, raise an objection to the conclusion that that three-level enhancement was necessary. And simply what the court said was, I think the evidence here in the pre-sentence report is accurate. And by preponderance of the evidence, at least, he was a manager at different times of Constance Lehman, Kathleen Varner. He instructed Varner to collect money for him and instructed his sister, Rebecca Burnley, who is not indicted but is part of the conspiracy, to move the money on his behalf. That is the sum total of the district court's analysis of that issue. There is no discussion of, in particular, of any of the seven factors. Arguably, those statements went to one of the factors, which was the seven factors, the degree of control and authority. The district court's decision seemed to say that there was some control or authority there. Mr. Walters, excuse me, Judge Diaz here. Is it your position that a court has to find evidence sufficient to satisfy all of the factors or, say, for example, in this case, the court had expressly recognized these factors and said, well, it may be that some of these don't apply, but I'm satisfied that because he was an active manager and or directed the two individuals that you identify, that that's enough in my book. So what's your take on that? Certainly, Your Honor. First of all, I don't think the district court ever said that in this case. But with that said, my understanding of the cases, and it's not so much that the court has ever said you have to consider all of them. The court seemed to mention some of them. So I think the answer to the court's question is I'm unaware of any case law or in the guidelines requirement that all the factors be considered and all of them be weighed. And the court articulate its weighing of those. I do think that is the answer that the court is supposed to consider all of them. And if some are not factors are not relevant in a particular case, it should say so. It's to get meaningful appellate review. The court has to indicate I am considering these factors and here are the facts that I am applying to them. So in the chamber's case that I think you were relying on, there was I think the court was concerned that there was simply no indication that the court made any findings with respect to this issue of whether or not someone was a manager, leader or supervisor. But that's not this case. I mean, the district court judge seemed to focus in on what it seemed to me anyway, whether pertinent was the relevant evidence on whether or not there was enough to warrant the enhancement. So why isn't this case different than Chambers? Sure. Well, Chambers, what the court said was that the district court found simply that Chambers was at least a supervisor at some level. That was to some extent of what the district court said in Chambers. Here, I would say to be honest, not that much different other than he says, OK, he instructed Varner to collect money for him and instructed his sister, Rebecca Burnley, to move money for him. That's the only additional things the court says here besides what was said in Chambers. Our issue there, Your Honor, is when you look at the testimony that was before the court, that was not in fact what people testified to. Varner never testified that she was instructed by Burnley to collect money for him. And her testimony is at pages 101 through 123 of the joint appendix. And if you read through that, you're never going to find her saying that I was instructed by Burnley to collect money for him. She says that Christopher Mays was supposed to collect money, but, oh, he never did that. So this gets into, obviously, the court reviews to the extent that the district court made a factual finding that Burnley instructed Varner to collect money for him. Our position there, Your Honor, that's just simply clearly erroneous. When you look at Varner's testimony, she never said that. Nobody ever said that Burnley instructed her to collect money for him. Various people said, oh, yeah, people were supposed to give money to Burnley for drugs that were sold while he was in jail. But the whole issue is nobody ever did it. Nobody ever followed that instruction. And this really gets to, I think, the core of – this was an issue that the court in Wilson, which was after our briefing was done, it was – of this conspiracy. But wasn't there evidence in the record that immediately after his arrest, he did direct several of his co-actors to go try and retrieve the evidence of the drugs that were allegedly thrown out of the car as he fled from the police? Your Honor, again, this is where a careful read of what the testimony actually was is important. What – and again, I was going to make a comment about – and I'm just reflecting on myself that I was old enough to know who Rodney Danger was. And I appreciate Your Honor humoring me on that. I also have an age-related problem that all the names here are sort of running together. But if you look at the testimony – I think Mr. Walters, you and I are both old enough. I imagine if I had mentioned that to my law clerks, they would have looked at me with vacant stares because I don't know that they would have had a clue who Rodney Dangerfield was. But that's neither here nor there. So go ahead. Certainly. So what the testimony was was that he called me and told me he had thrown the stuff out there. And she said there were some pills for me there. And this gets to Judge Gregory's point in the Wilson decision, which is you really have to look more deeply at these things. Sometimes this is just what people who are in the Wilson case involved, the gang, the people in a group, will ask each other to do things for them. The analogy I had in my brief is two employees are carrying the desk upstairs. And one of them tells the other one, put it down and turn left here. That doesn't mean the other person is under their control. They're just doing what people would do to help each other out. So I think if you're on a looks at that testimony, nobody says he told me to go out and find these drugs. And I felt compelled to do that because he's my boss. It's hey, I wanted some pills. And, you know, we're all in this drug business. And he told me where he'd thrown it. And I think an equally plausible read, and certainly the district court doesn't address this at all, is that, yeah, she wanted to get her pills. And there were some drugs out there. She went to get them. Of course, it turns out they're not there when she goes. So, again, the issue isn't so much did Mr. X tell somebody to do something and then that person did it. It's did the person do it because they felt that they were subject to the hegemony or control of the person who gave that direction. And I think looked at in this context, a lot of what the people do here is what people who are drug dealers and drug users and drug sellers would do. Okay, the guy I was getting stuff from is now in trouble or he's in prison. I'm going to start reaching out and finding out who my supplier can be, those types of things. Fortunately, for your honors, I'm not allowed to submit a 200-page brief. I think the best brief in this case is the entirety of the testimony. If your honors work through that testimony, I don't think you'll ever see any true indication that anybody felt compelled to do what Mr. Burnley suggested they do. In the Kimmel case, when people make suggestions, even in a business context, Kimmel was the one involving the used car Ponzi scheme. People may well take those suggestions. It may make good business sense, but that's a quite different thing from saying, I felt compelled to do this because this person exercised dominion and control over me. The First Circuit has a humorous analogy to the Oscar Mayer hot dog salesman and those types of things. To circle back to the first point, these are all important things and there's simply no analysis from the district court with respect to that. Certainly, what the court has said in Chambers and I believe in the Kimmel case was another one where it was sent back. It may well be that the evidence would support that conclusion, but the district court has not done the required analysis on the record for this court to say, yes, that was a non-erroneous decision by the district court. Well, it has to be clearly erroneous, right? It's just not that we think he might, she, Judge Crowe, I think, might be wrong. The judge has to be clearly wrong. Well, certainly on any factual issues reviewed for clear error. And again, we isolated a number of areas in the testimony in our briefs. But again, I don't mean to keep inviting the court to spend a couple of enjoyable hours reading that testimony. But again, Your Honor, the findings that were articulated we do submit are clearly erroneous. One is to say that Varner was instructed to collect money for him when Varner never instructed and nobody else ever testified that she was instructed to collect money for him. And the testimony in the record indicates that she didn't actually collect any money for him. The other reference was to Becky Burnley being told to move money. But again, Becky Burnley didn't testify at trial. And Christopher Mays, who did testify, one of the main witnesses, said it was Mario that told him to give the money to Becky. But anyway, he never testifies that he did it. And it's clear that the next discussion with Mario, they decided to cut Burnley entirely out of the operation. So I agree that it's reviewed for clear error. I think the court's decisions in Chambers and Lamas, which was another one that dealt with what happens when the district court fails to make these findings, simply said, look, the evidence may or may not support this district court. It's coming back to you, and you have to perform that analysis. I think the government invites the court to say, well, let's look at all the other evidence that's out there. But, of course, that was explicitly rejected in the Lamas. The court said, no, that's not how it works. That's not what we do in 3B1B cases. So that I think, you know, on the record we have, I submit that those findings are clearly erroneous, because I think what happened, Your Honor, was that that is what the probation officer said in the pre-sentence report. The district court said almost verbatim. But, again, when you look at the testimony and then you look at the underlying description of the events in the case in the PSR, that those statements aren't there either. So I do submit, Your Honor, that those are clearly erroneous. It is the test for factual determinations are made. But I would submit that Lamas and Chambers indicate that if that analysis has not been done, the court may never get to the clearly erroneous test. It has to send it back and have the district court do that analysis in the first instance. I see we've just got a couple minutes left. I don't want to, if I haven't answered Your Honor's questions, I don't want to move on. But I just wanted to briefly touch on the flight from arrest to level enhancement. And, again, this is one where the courts have not adopted a bright line test that every time you have somebody fleeing arrest in a car, you automatically get that enhancement. This court's decisions, again, we cited a number of them in our briefs, have indicated... There may not be a bright line test, but it would seem to me to be almost common sense that if someone flees from the police in a car and in the process runs over one of the officers' foot, that that would seem to satisfy the requirement that it was done with at least a reasonable probability that someone could be severely hurt, injured, or otherwise. So, anyway, why isn't that just common sense that on these facts, those facts, plus the fact that he led them on a high-speed chase for an extended period of time, why isn't that enough to satisfy the enhancement? Certainly, Your Honor, a couple of quick answers. I see I'm down a minute and a half. If I'd like to at least finish the answer, I suspect I'm going to run over. First off, as we discussed in our brief, the running over the foot... Well, let me back up. The district court in its factual findings on... This is Judge King. Certainly. This argument's not nearly as good as the one you had with the first factor, or first maximum. You admit that, don't you? Well, it's never what I like to hear, Your Honor. I was telling my wife last night, I'm always really impressed with the strength of my argument right before I argue it. You know, I do think, Your Honor, that certainly the 3B1.1B1 is stronger. I do think there's less to the running over the foot than appears. The officer told him he was fine. Well, he ran over the foot. Another few inches, he could have killed the officer. Just on that point. And then he ended up in an accident. A wreck, too, right? Well, they did, I think, one of these controlled impact things where the officer hit the back of the car to cause the other car to go off the road. You know, I'd admit, Judge King, Your Honor, that running over the officer's foot is not the most helpful fact in the scenario I have here. I think the strongest issue there was the judge didn't articulate that that was an issue he was considering. And I think Lamas and Chambers made clear those were at least 3B1B cases rather than 2C1, whatever this is. This jumps off the page here, though. It's the odds indicator. Well, it certainly does. There's no way to sugarcoat that one other than, you know, is that rise to the level of having toddlers in the car and shooting your automatic pistol out the window at them? You know, you're right. There's no bright line rule. You have to draw the line somewhere. I would assume, Your Honor, that simply looking at the facts with respect to A, the district court didn't rely on that and didn't even mention that in his decision. And within a moment, Officer Sanchez, Deputy Sanchez, was able to have Mr. Burnley back in his sight. So nobody spent a lot of time trying to figure out what happened. But like I said, I'm not going to sugarcoat it, Your Honor. That's not the most helpful fact out there. I see I'm well past my time. It looks like Judge Gregory might have a question for him. Maybe he's just going to tell me to sit down. No, no, no. I just want to say cut to the chase, Mr. Walters. What element of that enhancement is not present here? What element of the reckless flight from? Yeah. What element is not present? Well, I think, Your Honor, the recklessness element. I mean, if you're going to say every time you flee from the police that that's reckless, then you've got, you know, just the default every time there is fleeing from the police in a car. You know, I guess you could have a case where the person peels out at a calm 25 miles an hour, you know, stops at a stoplight. But clearly that's not ever going to be a situation either. So I think the recklessness is absent in the sense that this was in the middle of the night. It was 255 in the morning on rural roads. There's simply no evidence in the record whatsoever of any other thing other than he fled. And there's a Deputy Sanchez never gives a speed as one of the PSR says high speed. So really, we do know a pedestrian was nearby. The one whose foot was run over? Yeah. Well, no, right. So that's the only factor there. If you say yes. You need anything else for recklessness? Well, I know what my answer has to be, Your Honor. And I would submit that there's recklessness. And then there's, you know, what the facts in this case show. And I understand Judge Diaz's question. You know, it could have or Judge King's question. It could have been a lot worse. Well, the facts in your case is pretty bad, pretty bad. Because as Judge King said, a few inches, you may have an officer that was severely injured and perhaps killed. So it was hard to take your scenario out of a situation where it's not close to recklessness. I mean, you would be a case where nothing happened. It was 2 o'clock in the morning. Nobody was on the road. Stopped in 500 yards. And where's the recklessness? Those are not your facts here. No, they're not. And after 100 some odd times in front of Your Honors, I've sort of learned to not belabor losing points. But that's the sum of our argument, Your Honor, that in comparison to other cases, there's one factor here, yes. Whether that one factor gets it over the 50-yard line, I'm obviously going to defer to the panel. And I sense where that's going. I do see I'm three minutes over. If the panel has any other questions on the 3B1.1, I'm more than happy to address them. Mr. Walters, I do have an additional question. So if we don't agree with you on the second enhancement but believe that there might be some merit to the first, does that change the guideline sentence in this case or is it still within the reduced guideline? I do not have the table in front of me. If both of them were granted, it would drop to a 36. He was at a 41. Five would drop it at 36. As I recall, 36 may be the point at which the lower end of the range starts to go down. I'm certainly happy to look at that during opposing counsel's time period. I'm just wondering if the second one is against you but the first one is with you, but the guideline range, the sentences within the modified guideline range, whether there's at least a contention that it doesn't matter. Well, Your Honor, and I don't mean to make the government's argument for it. I mean, the sentence, but it ties into what my response would be. The district court sentenced under the range anyway. It gave a 300-month sentence at the original case even though that was below the bottom end. Our position would be, given that the district court has indicated its indication to give a sentence below what the guidelines would otherwise call for, that if the offense level is going to be even lower, that there is a plausible argument that he could have sentenced even further down if the offense level was not so high, Your Honor. Thank you. All right. Thank you, Mr. Walters. Ms. Rottenborn? Yes, good morning, Your Honors. Laura Rottenborn on behalf of the government. The district court's factual determination that the managerial role enhancement should apply here was not clearly erroneous. As this court held in Holmes, once a court has determined that the defendant exercised some control over at least one participant, it need look no further to whether the defendant exercised control over anyone else. Here, our district court found that the defendant exercised control over at least three people. And if it suits the court, I thought I would identify the portions of the record where the managerial role of Mr. Burnley is most clear. The district court found that Defendant Burnley managed co-conspirator Varner and did so in multiple ways. JA-111, which is Varner's testimony, talks about the specific role she played under his managerial influence in helping distribute the kilos of meth that he was purchasing from his source of supply, Mario. The testimony on JA-111 explains that Burnley would buy the meth from Mario, bring it back, divide it up at his home, and hide the meth in lesser quantities in PVC pipes, which he would then hide in the forest or around his yard. And he would then instruct Varner at various times to go collect the meth when he was ready to sell it. And Varner would do so. She would collect the meth from these PVC pipes, and then she testified that she would drive around with Burnley when he would sell it. It is also clear that this fetching that Varner would do of the drugs was again repeated after Burnley was arrested when he instructed her from jail to go collect the meth that he had thrown out the window during the high-speed chase when he was eluding police. These facts alone are sufficient to warrant the managerial role enhancement, especially under a clearly erroneous standard of review. Opposing counsel stated that nobody had testified... Ron Lord, can I ask a question? So that series of facts that you just laid out, I have no doubt that they appear in the record, but the question is whether or not the district court found those specific facts. Did the court find that? The court found that Burnley was a manager at different times of Varner, and that he had instructed Varner to collect money for him. Those are the specific sentences that the district court articulated when imposing the guideline enhancement. And it's the government's position that that is a sufficient factual finding to support the enhancement here, and that further specificity is not required. It is of course clear that a trial court must state with particularity the individual reasons it's imposing a chosen sentence. But the case law makes more clear that the degree of specificity required when making a finding of fact upon which that sentence is predicated is substantially less. And as Judge Keenan explained in the 2013 Steffen decision, which postdates Chambers, this court, when reviewing a factual finding, can look both at what the reasons are articulated by the district court judge or may affirm based on any evidence in the record. So here it's the government's position that yes, the district court judge made a sufficient factual finding when he said that Burnley was the manager of Varner and instructed Varner to collect money for him. But this court, of course, may look beyond those factual findings to the evidence in the record, the undisputed evidence in the record, and conclude that the enhancement was properly applied. I would also note here that... Ms. Rotenborn? Yes, Judge King. Ms. Rotenborn, this is Judge King. Good morning. In your position, we need to, that is the court, needs to mine the record a little bit and see if your position is solid, even though the judge didn't articulate it. I don't think that's necessary in this case, Your Honor. The judge articulated specifically that Burnley instructed Varner to collect money for him, and that is sufficient to apply the managerial role enhancement here. The court is, of course, welcome to review the record in its entirety and decide whether or not there's sufficient evidence to imply the enhancement based on other facts. And here the record would support that. But the reasons specified by the district court judge here are sufficient alone. In addition to specifying that Burnley had instructed Varner to collect money for him, and the support for that, by the way, is at JA-132, and it's not Varner's testimony. It's Knowles' testimony, Christopher Knowles, who said that Varner came to collect the money on Wayne's behalf. But the judge also found that Burnley had instructed his sister, Rebecca Burnley, to collect money on his behalf as well. And that is supported in the record at JA-84 through the testimony of Christopher Mays, where he testified that he had to pay Rebecca Burnley the money that he owned the defendant, Wayne Burnley. And the judge made that specific finding at JA-370 to 371 that Burnley had instructed his sister, Rebecca, to move the money on his behalf. And so it's the government's position that those specific factual findings, which the district judge made four, are sufficient to support the application of the managerial role enhancement here. I also note that in addition to the four statements provided by the district court judge, the PSR had two additional reasons for applying the enhancement. And all of the facts underlying the enhancement application in this case were uncontested by the defendant. Mr. Burnley did not raise any objections to the offense conduct in the PSR. And these facts about Varner having to collect money, Rebecca Burnley collecting money, and Varner collecting meth from the PVC pipes on Burnley's behalf were and remain uncontested by the defendant. I also know that the district court judge found that Burnley was a manager at different times of Connie Lehman. And the support for that can be found in the PSR at paragraph 55, which is JA-487, and in her own testimony from trial at JA-50 through 56. And although I can see that I don't think the managerial influence over Lehman is as clear or as frequent as the managerial influence over Varner, it does exist in the record and provides an additional basis on which to apply the managerial role enhancement. In short, the goal of the managerial role enhancement is to reflect the relative responsibility that Burnley played in this criminal enterprise. And here the district court made a common sense judgment about his relative culpability by realizing that his status in the hierarchy was higher than Lehman, Varner, and his sister Rebecca Burnley, all of whom played a role in the day-to-day operations of this drug business, both before and after Burnley's arrest. Judge Keenan wrote in the Steffen decision that the significance of the evidence before us is not mitigated by the fact that in other cases affirming the imposition of the enhancement, we relied on substantially greater evidence of the defendant's managerial role. I would say the same is true here. I think there is abundant evidence to support the application of the managerial role. And although it may not rise to the level of the evidence in some of the cases cited by my opposing counsel, it is more than sufficient to not be clearly erroneous. So I guess you don't think that Mr. Burnley is the Rodney Dangerfield of a Beth conspiracy? Respectfully no, Your Honor. We do believe, although he was not the kingpin. Do you even know who Rodney Dangerfield is? I do, Your Honor. I would put myself somewhere in between, in the middle of my knowledge of Rodney Dangerfield, between you and your law clerks. I'm perhaps not an expert, but I did appreciate my opposing counsel's reference in his brief, and I appreciated the chuckle that came with it. So can I ask you, on a bit more serious note, how you reconcile the holding in chambers with what happened here? I mean, we seem to suggest in chambers that if the district court doesn't go out of its way to consider all of the relevant factors for this enhancement, that we can't conduct meaningful appellate review. So what is it about this case that makes it different? Respectfully, Your Honor, I think chambers overstate the obligation that should be imposed on the trial court, and subsequent decisions of this court that postdate chambers don't imply that same rigid level of expectation with respect to the commentary of the guidelines. Excuse me, counsel, were any of those post decisions en banc? No, Your Honor, they were not. What makes you think they would overturn chambers? Correct, Your Honor. Of course, a panel of one cannot overturn a panel of another. But to the extent that opposing counsel or this panel is reading chambers as to require a district court to review all seven factors suggested by the commentary of the guidelines, or else this panel cannot conduct a meaningful review of the trial court's decision, I do not think chambers holds that. No, the chambers, of course, suggests that we're not supposed to hunt through the whole record to find a way to justify something that's not mentioned and grappled with by the district court. Absolutely, Your Honor. But you're suggesting that's what we need to do. We can hunt and we can find, maybe we scurry through the record and cobble it together, we can say that this is managing. Because I find that he was a manager, that's not a finding of fact, that's just a conclusion. The whole point is we're trying to find out if he were a manager to find that he, well, he supervised someone. That's not a finding of fact, really, that's a conclusion. That's for the court to determine, but it needs facts to justify that. As a matter of fact, you said she was with him when he was selling drugs, correct? She was with him, although I do not think that supports the application of the managerial role enhancement. The government does not suggest that simply selling drugs or being present when somebody else sells drugs would be sufficient. And let me be clear here, in chambers, the panel reversed holding that the trial court's statement that the defendant was a supervisor at some level was not specific enough to allow for meaningful appellate review. But that is not the case here. Our trial court specifically found that Burnley, and I quote, instructed Barner to collect money for him and instructed Rebecca Burnley, his sister, to move money on his behalf. And those are specific factual findings that explain why Burnley was in a managerial or supervisory role vis-a-vis those individuals and those co-conspirators. This is not the case where the trial court just said he was a manager, hard-sought, period, and this court can't do anything with that type of analysis. He said he instructed her, correct? Instructed Barner to collect money for him as part of the drug operation, yes. But somebody else said that was the case, right? Yes, so yes, Barner testified, as did Christopher Knowles, and Christopher Knowles testified that Barner was collecting money from him on behalf of Mr. Burnley. The same testimony was given by Christopher Mays, saying that Mr. Burnley's sister, Rebecca Burnley, was collecting money on Mr. Burnley's behalf. So he supervised these individuals to collect drug proceeds on his behalf. I also know that it's consistent with the rest of the testimony that Burnley fronted his drugs and expected payment later. In addition— But, you know, I don't want to quibble over semantics, but I think it's very important here because in these cases here, that means years of someone's life in prison. But, you know, I always thought supervising was more than just discrete acts. Like, oh, Mr. Walter Stanley said, you know, go get me some bubble gum from the store. And I did it five times. I'm not your supervisor, necessarily. Supervision seems to have—comes with it. The denotation of it is that it involves to supervise, you know, to be over someone, to have some—it's a relationship more than just an act. I mean, so, I mean, we have plenty of cases of driving along with someone, accompanying them while they're selling drugs. That alone is not supervision, necessarily, because they're with you. Say, come ride with me, but I'm going to sell some smack. And you're with them. That doesn't make you a supervisor. They inquire you there because he said, listen, the guys over there, can you just hand me this for a little while? I mean, so we're turning these cases into just everything that you said someone said to you and you did it means you're a supervisor. I mean, these cases have to be very careful. There is something about the rule of lenity and those kind of things. I know you can do hearsay. We're stretching—I think the framers would be just mortified that you can use, not in this case, but acquitted conduct. I mean, we have stretched the whole idea of constitutional protections to the point where it's almost unrecognizable. Yes, Your Honor, I understand that. Because you said he instructed. You're saying that. Not only you, Remy, but the judge said it. But was that the testimony that was instructed that said she came and collected the money? I bet that's what they said. That was it. She instructed. Was that the word that the person used? Respectfully, Your Honor, it was indeed. I believe it was that you were told to do this. And I actually do believe that the word instruct was used at one point. I'm confirming right now in the record. But this person—this is a person who wasn't a person, right? This is somebody else's statement, right? This is not Varner's statement, right? Varner's testimony, yes, is at JA-111 where she explains that Burnley would purchase kilos of meth, bring it back to the home, break it down in ounces and put it in Tupperware or PVC pipes and then hide it in the woods or on the back roads near his house and all around his home. And that she would work with him to do this. And then he would tell her to jump out of the car and go get the meth that they had hidden when it was time to then distribute that meth. That was before he was arrested. And then after he was arrested, she was one of the people Burnley instructed to go find the meth that he had thrown out of the window when he was eluding police. But I want to emphasize here these are not one-off instances or isolated directions that Your Honor is worried about. This is not the case where it is stretching the application of the enhancement too far. Mr. Burnley was a significant drug dealer who had many people running his operation for him and with him. And he would provide instructions and manage that operation on a daily basis. The record supports that not only did he instruct Varner to do these things, but that he at times instructed, for example, Donald, which was another co-conspirator, to go collect money from Christopher Knowles, that he had so much managerial influence that he controlled who came into the fold and who would work directly with his supplier, Mario, who was providing the kilos of meth. And that once he blessed a lower-level street dealer to work directly with Mario, that the price of that meth would go up in order for Burnley to get his cut for making the connection. There was a clear hierarchy here. Mario was the primary distributor, down to Burnley, who then had a variety of people either as street dealers or as co-conspirators helping him run this operation. But Burnley was calling the shots. He was the one exercising decision-making authority, as the factors suggest this court should consider, in terms of where the drugs were going, who was allowed to sell them, and when and where they were being distributed. Mr. Rottenberg, can I add? Excuse me. Yes, John. You just went through a detailed recitation of the record that appears to amply support a finding with respect to the enhancement. And I get your point that what I'm about to say may not be this case. But let's say the district court, in this case, simply recited the language of the enhancement and said, based on the record evidence, I find that the defendant satisfies the enhancement. And you've got all this record evidence that the government would seem to say supports that enhancement. Would that be enough? Or does the district court actually have to make some findings about the evidence in the record? Respectfully, Your Honor, the Fourth Circuit's case law on that point comes to different conclusions depending on the case you read. And there are cases… So they go back to Chambers? Chambers predates Holmes from 2010 and Steffen from 2013. Chambers is in 1993. That's correct. That's early on in these guidelines. That's very early in these guidelines. And who's the author of Chambers? I'm checking, Your Honor. Which judge wrote that? I think it's Judge Williams. Judge Williams? Yes, Your Honor. Yes, that's right. Judge Williams. Okay. That's correct. And Judge Williams' opinion, then, is the guiding light for this. The other opinions can't change, as Judge Gregory pointed out. Unless you've got an in-bank case, Judge Chambers is what controls. Chambers is a case that speaks to the topic. But it holds that when the judge found that the defendant was a supervisor at some level and made no additional findings, and there was not undisputed facts in the record that made that finding clear, that they sent the decision back for the judge to assess the factors and make more specific findings on the record. But the majority of the decisions that I was able to identify and that I have reviewed have made the holding that this court can affirm on any basis in the record. And that means that because it is a factual finding and not a legal application of the guidelines, that even if the district court does not clearly articulate his reasons for the application of the enhancement, if, based on the undisputed facts in the record, this court finds that the enhancement would be satisfied, this court can affirm. And that is the holding in Holmes and Steffen and Bartley and all of the cases from the last two decades that are cited in Burnley's brief. You mean, counsel, and I follow your reasoning, but doesn't that really mean that, as an appellate court, we're doing the sentencing ourselves? No, Your Honor. To the extent that there would be disputed facts or lack of clarity in the record to conduct a meaningful appellate review on this issue, I understand why the panel would send it back. But just like you look at a sufficiency of the evidence claim, here, when you're looking at a sufficiency of the evidence to support the application of a factual determination that results in a sentencing enhancement, this court can look at that record just as you would a trial record and determine whether or not it, as a whole, supports the factual finding. Yeah, I always thought the sufficiency of the finding of fact is what we're looking at that supports the enhancement. But now you're saying we can do it by our job is, in the first instance, look at the record, which had not been, for example, looked at the district court or at least indicated that he or she did, and then we do it. So, I mean, we're sentencing them in the first instance, really. We're taking a cold record. And as you said, and I have no doubt that you represented properly the record, what you just told us, but we're now hearing that as if we were at the sentencing ourselves and then we're making that finding. I thought when you said we're an appellate court and it had to be enough for our review of what the court showed that it did. And that's what Chambers is talking about. And this accretion you talked about in terms of I call it case law accretion. In a sense, because it can't change the basic idea that Judge Diaz hypothetical to your question, you was just spot on. If all the judge says that I'm giving the enhancement because he was a supervisor, that's all. Then that's fine as long as counsel, brilliant counsel like you for the government can come in and point to all of these places and the J.A. And then from the first instance, we say, you know, you're right. I think that is supervision. Oh, yeah, that went to. So that's what you think the law of the Fourth Circuit is about. He's devolved into your honor. I see that my time is up. May I answer your question? Absolutely. Absolutely. Thank you. I first want to emphasize that that's not this case. Our trial court made specific factual findings about two individuals who had to move money on behalf of Mr. Burnley. As supervisees or as people, he was managing. And so this court does not need to reach the question that Judge Gregory, you're concerned about in this case, because our trial court judge made specific factual findings. So do you agree that we can be left to all of the ones that he made, not the ones, all the ones you're talking about? Yes, your honor. Absolutely. So you can see that. OK. Yes. And that is and that is supported by this court's decision in Kellam from 2009, where the court found that it was enough that the defendant had fronted drugs to his resellers and had established a place in the hierarchy because that showed that the defendant retained some level of control over how and where the drugs were going to be distributed and how the finances would work. Thank you again. Fronting someone's drug doesn't mean you're a supervisor. That means if you take that analogy, then the banker is a supervisor, the person who got a loan from them or it's not supervision. I mean, these are conspiracies, right? You're not supervising the individual to whom you fronted the drugs. But if you are a drug dealer and you front the drugs to John Doe and then you send Jane Smith to go collect the money from John Doe as your standard operating practice, as part of your drug business and Jane Doe has to do what you say to bring the money back to you because that's her role in the drug enterprise, then, yes, that is a managerial role that the person higher up in the hierarchy is executing upon. And that is what this court has held in Holmes and in Kellam and in Stephan and in Bartley. And this case is right in the heartland of those cases. And based on the specific factual findings that our trial court made, this court should affirm the imposition of the enhancement, find that it is not clearly erroneous, and affirm the sentence in this case. Thank you, Ms. Rodenborn. Thank you, Your Honors. Ms. Rodenborn has given you a lot to say and you don't have a lot of time, but get to it. Well, court reporters always tell me I talk too fast, so I will see what I can do here. I would invite the court to look at Judge King's decision in Lamas, which is cited in our briefs. It deals with this question exactly. In that case, the government conceded error on enhancement. And it said, the government seeks to salvage the district court's application, in that case of the vulnerable victim adjustment, by relying on other aspects of the record which the court did not address. And it then shuts that down. It says, in these circumstances, application of the vulnerable victim adjustment cannot be justified simply because there might be some evidence in the record not addressed by the sentencing court supporting that particular enhancement. So, Lamas is a 2010 decision. Judge King wrote it. I'll defer to him. But I think Chambers is alive and well. And the Lamas decision relies on Carter, which said the same thing. The court is not allowed to go look at other places in the record on these enhancements. The district court needs to make factual findings. Trial counsel objected to the conclusion, so the court needs to articulate the conclusion it's reaching, the facts it relies on to support that. And the government is not allowed, and this court is not allowed, to go look elsewhere in the record for it. With respect to that, I just want to then address a couple of things. So, the government says that Burnley instructed her to go get the drugs she threw out the window. Now, of course, that is not anything the district court relied on, so I'm not going to go too far down this rabbit hole. But all that she says is, did he call you and tell you anything? Yes. He was trying to tell me where to find what he had thrown out. She doesn't say he told me to go get it. She doesn't say he directed me. She doesn't say I felt like I better do it or my boss was going to be mad at me. She wanted some pills. She was a drug user. He told her where some stuff was. And, Judge Gregg, you would ask the question, does anybody ever use the word directed? No. Certainly not the people who were actually claimed to be directed. But if you look at the testimony of the other people, it's like Your Honor pointed out. People came and said, you're supposed to give me money. They didn't tell any of these people, Burnley told me to come get money from you. I feel compelled to do it. He's my boss. I think Your Honor's pointed out, the natural thing, this is again what Your Honor added in Wilson, in drug conspiracies, people are asking people to do stuff all the time. And people do it to get along. And I think the important point Your Honor has made, and again made in Wilson, is that these are kind of subtle things. So the district court needs to move beyond this person told this person to do it and they did it and get into figuring out why that person did it. Was it a gang member helping out another gang member or was it because it was the gang boss and if I didn't do it, I was going to be in trouble. And I think that's really what, and the First Circuit articulated this probably the best, is what we're looking at is, are there going to be consequences? This is sort of the, I can't remember the name of the case that involved the call center down in Costa Rica. I think it may have been Lamas. Who's the enforcer here? That was Lamas. I didn't say that they were told to do this, but on the entirety of the circumstances, I conclude that this person wasn't just doing this because they were another drug dealer. They were doing this because they really felt that Burnley was the boss. So I do think that the court has been articulate on a number of occasions that we cannot, at the appellate stage, go and find other evidence in the record to support the conclusion. It has to be the facts that the district court cited in its ruling on that issue. And Your Honor is completely correct, Judge Gregg. The district court didn't actually make a factual finding. It just made a conclusion. If that was a complaint I was answering, I would say, well, that states a legal conclusion and no affirmative response is required. But then you get into this issue of no factual findings were made on that. And to the extent you can go and look in the record, it would be limited to that. Mr. Walters, I'm sorry. When you say the court didn't make any factual findings, I mean, there were at least two in this admittedly very brief explanation. One, that he instructed Varner to collect money for him and instructed his sister Burnley to move money on his behalf. So I guess the question is, is that or those findings, those are factual findings, don't you agree? Yes. And I submit they're both clearly erroneous. You will search the record in vain to find anybody. Okay. But that's a different point. But he, Judge Moon, did make findings. And so the question is, two questions. Are they supported by the record? You say they're not. But if they are, is that enough to support the enhancement? And I guess you say on both points, no. No. And to deal with the second one here, it's because there's a number of other factors that the court has to consider. I agree with government counsel that I don't think there's a Fourth Circuit decision that says the sentence must be reversed if all seven factors are not articulated or discussed. But I do think that the court needs to at least indicate that I'm aware that those factors are out there. And I'm concluding that this one really controls the day or the other ones don't apply or they help or they don't help. It's a multi-factor test. And I think simply to come in and say, I find these two things. That's one of the factors. Are you in support of the factors? Good enough for me. I think this court's decisions require more. And I, again, I think the record simply just does not support those conclusions to the extent that that's what they are. All right. Thank you, counsel. I know, Mr. Walters, that you're caught up on it. I just want to say a special note on behalf of the Fourth Circuit. Thank you. Certainly, your honor. Thank you for the help of lawyers like yourself who take these cases and help us deal with these difficult issues. And, Mr. Rodenbaum, you've certainly able to represent the United States here today as well. Thank you both for a very, very, very, very strong arguments and very difficult matters that are important to our criminal justice system. Thank you. Thank you. I can't come down and shake your hand and say that we are. Our appreciation is nonetheless heartfelt and we appreciate it. Thank you so much. We hope that you will both be safe and stay well. Thank you. All right. Bye bye. Bye.
judges: Roger L. Gregory, Robert B. King, Albert Diaz